UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

ROSANNA GUIDO,

|  |  |  |
|---|---|---|
| | Plaintiff, | Civil Action No.: 13-13520 |
| | | Honorable Stephen J. Murphy, III |
| v. | | Magistrate Judge David R. Grand |

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

Defendant.

_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [14, 17]**

Plaintiff Rosanna Guido brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [14, 17], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.     RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge ("ALJ") erred in her Step Three analysis, as she failed to explain to what extent she relied on the reviewing psychologist in determining the issue of medical equivalence and failed to obtain an updated medical opinion in light of the significant body of evidence that came after the Commissioner's initial denial of benefits. The ALJ further erred in failing to obtain any medical opinion whatsoever as to Guido's functional limitations, instead formulating limitations based on

her own review of the medical evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [17] be DENIED, Guido's motion [14] be GRANTED IN PART AND DENIED IN PART and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be REMANDED for further consideration consistent with this Report and Recommendation.

## II.    REPORT

### A.    Procedural History

On December 15, 2010, Guido filed applications for DIB and SSI, alleging disability as of December 7, 2010. (Tr. 112-124). Both claims were denied initially on March 24, 2011. (Tr. 55-73). Thereafter, Guido filed a timely request for an administrative hearing, which was held on February 10, 2012 before ALJ Oksana Xenos. (Tr. 23-52). Guido, represented by attorney Daniel Stoner, testified, as did vocational expert ("VE") Don Harrison. (*Id.*). On March 16, 2012, the ALJ found Guido not disabled. (Tr. 9-22). On June 22, 2013, the Appeals Council denied review. (Tr. 1-6). Guido filed for judicial review of the final decision on August 16, 2013. [1].

### B.    Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

## C.   Background

### 1.   *Plaintiff's Testimony and Subjective Reports*

Guido was 27 years old at the time of her application.  (Tr. 112).  She reported being unable to work since her alleged onset date due to bipolar disorder.  (Tr. 145).  She had previously worked in daycare and as a hair stylist, and had both a college degree and a cosmetology degree.  (Tr. 145-46).  She reported being treated for her conditions and taking

lithium and Seroquel. (Tr. 147-51). Guido reported difficulty concentrating, getting along with others and managing her anger, due to her conditions. (Tr. 181). She also reported suffering side effects of her medications including tremors and drowsiness. (Tr. 181; 188).

Guido quit her last job as a hairstylist in December 2010 when she was admitted to the hospital for her conditions. (Tr. 31). She had also been admitted to the hospital for her conditions on three other occasions. (Tr. 38). She reported that one of those incidences was when she stopped taking her medication due to thought commands directing her to stop. (Tr. 38-40). She testified having both manic and depressed episodes. (Tr. 41-42). She and her brother testified that she has lived with him for the past ten years and that neither she nor her brother believes she is capable of living on her own at this point. (Tr. 28; 42; 45).

Guido's day consists of waking at 9 a.m., exercising for an hour, going to therapy, eating, taking medication, napping and visiting with family. (Tr. 32; 46; 182). She reported suffering from insomnia when she did not have her medications, but now sleeps 10-12 hours a night, and sometimes naps during the day as a result of the medications. (Tr. 32; 36; 43; 182). She reported no problems in personal care, although she needs reminders to take her medications. (Tr. 32-33; 182-83). She cooks her own meals daily, does household chores, can go outside on her own, drive and shop. (Tr. 33; 183-84). However, her brother testified that in order to provide her as much structure as possible, he has required her to sign a contract regarding chores and other household rules that the two can rely on in the event of an episode. (Tr. 46-47). Her brother and aunt stated that they ensure she takes her medication, including auditing her pills. (Tr. 46; 159). He testified that a good day for Guido is her waking up, taking her medications and going to bed without hearing voices, seeing things or setting an alarm on the house. (Tr. 45-46). He testified that at times she has appeared possessed, scratching at the glass, wearing her

clothes backwards and pulling her hair out.  (Tr. 45).

Guido reported that she enjoys books, computers, exercising and watching television, but is not reading as long as she used to, and watching more television.  (Tr. 33-34; 185).  She also likes writing, drawing, decorating, organizing and sewing.  (Tr. 34).  She reported visiting with family daily, attending church once a month, and her cousin's sporting events twice a month, but never spending time with friends.  (Tr. 185-86).  She can manage her own money, but is not good with it as she will often overspend and not realize it.  (Tr. 42).

Guido reported having a hard time remembering, following directions, completing tasks, concentrating, understanding, getting along with others and using her hands.  (Tr. 186).  She can only pay attention for 2-3 minutes at a time and has difficulty with written instructions but is better with spoken instructions as long as they are repeated and given step-by-step.  (Tr. 186).  Her brother testified that she cannot follow things anymore and that he could not imagine her being in a competitive work environment.  (Tr. 46).  Guido reported that she gets along with authority figures better now that she is on medication, and was never terminated from a job due to problems getting along with others only because she "always quit before getting to that point." (Tr. 187).  She reported not handling stress or change well.  (Tr. 187).  Her aunt completed a third-party report, supporting Guido's reports.  (Tr. 157-64).  Guido reported continuing problems in an appeals form in March 2011, noting that her doctors were still working on prescribing the right combinations of medications in the right doses to control her condition.  (Tr. 189).

2.      *Medical Evidence*

a.      *Treating Sources*

i.        *Prior to Alleged Onset Date*

Guido was treating with her primary care physician Dr. Tawfiq Hassan in 2009.  During the course of the year, Dr. Hassan prescribed and renewed Adderall for Guido's diagnosed attention deficit disorder ("ADD") and "lack of concentration."  He also noted that she had a "history of fatigue" but that she was stable during this period.  (Tr. 598-601).  She reported that the Adderall helped her a lot.  (Tr. 601).  As late as February 7, 2010, Guido continued to report to Dr. Hassan that she was doing well.  (Tr. 598).

Therapy notes provided by Guido's therapists at Community Care Services reveal that she was having difficulties at least as early as February 22, 2010.  (Tr. 441).  At an appointment on that date, as well as at appointments on March 1 and March 4, 2010, Guido was tearful, tangential, paranoid, and suspicious.  (Tr. 434-42).  She reported not believing she needed medication and did not believe there was anything wrong with her.  (*Id.*).  The therapist recommended on each occasion that Guido seek out a psychiatrist's recommendation, but she declined.  (*Id.*).  At the March 4 appointment, the therapist created a crisis plan for Guido's family.  (Tr. 434-46).

On March 7, 2010, Guido was admitted for inpatient treatment at Oakwood Heritage Hospital for anxiety, depression, aggressive behavior, paranoia and suicidal thoughts.  (Tr. 274-286).  She was observed as being emotional and crying, and having difficulty focusing and concentration, with thoughts that jumped around.  (Tr. 274).  She was also angry and irritable, with a labile mood.  (*Id.*).  Her diagnosis at admission was psychosis not otherwise specified,

6

severe, and she was issued a Global Assessment of Functioning ("GAF") Score of 25.[1]   (Tr. 275).  She was discharged six days later, on March 13, 2010.  (Tr. 278).  At the time of discharge she was stable, with reduced anxiety and depression, and was taking Risperdal.  (Tr. 278-79).  She had been removed from Adderall by the doctor.  (Tr. 278).  Guido's GAF score upon discharge was assessed as between 55-60.  (*Id.*).

Guido returned to outpatient treatment on March 15, 2010.  She was noted to be alert and more stable but still reported some unclear thinking and feelings of paranoia.  (Tr. 428-29).  She was scheduled for an intake evaluation.  (Tr. 429).  At a follow-up on March 22, Guido noted improvement since being on Risperdal.  (Tr. 425).  She was alert and engaged at that appointment.  (*Id.*).  The following day, she discussed her recent hospitalization with Dr. Hassan, and he referred her to a psychiatrist.  (Tr. 597).  Guido underwent an annual assessment with her therapist, who noted that her suspicion and paranoia were less intense since beginning medication, although she still has some confused thinking and paranoid thoughts.  (Tr. 411).  She reported receiving thought commands and being quick to anger prior to her last hospitalization, as well as mood swings lasting 1-2 weeks, grandiose thinking, sleep problems, and hyperverbalism.  (Tr. 411; 423).  The therapist diagnosed Guido with schizoaffective disorder, issued her a GAF score of 40 and referred her to the psychiatrist.  (Tr. 423).  This diagnosis was confirmed by the evaluating psychiatrist on April 6, 2010, although he modified it to schizoaffective disorder versus bipolar disorder.  (Tr. 397-401).  At that evaluation, Guido

---

[1] "The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious impairment in these areas." *Norris v. Comm'r of Soc. Sec.*, No. 11-5424, 461 Fed. Appx. 433, 436 n.1 (6th Cir. 2012) (citations omitted).

reported no longer using Adderall. (Tr. 397). She was found to be cooperative, with good speech and appropriate appearance. (Tr. 399). She was tangential at times, although redirectable. (*Id.*). She was anxious, with limited insight and fair judgment. (Tr. 400). She was issued a GAF score of 48 and a guarded prognosis. (Tr. 401).

At therapy sessions during April and into early May 2010, Guido presented mostly as alert and engaged, although was hyperverbal and unfocused at times, with difficulty concentrating or sitting still. (Tr. 377-96). She occasionally presented as tearful and sad, and reported that her brother was moving to Thailand for six months. (Tr. 389). At each appointment she was noted to be making some progress. (Tr. 377-96). On May 17, 2010, Guido returned to Dr. Hassan, claiming a need for Adderall. (Tr. 594). He found her stable and renewed her medications, which presumably included Adderall. (*Id.*). At her next therapy appointment, Guido reported having had a "bad week for no reason and decided to see [an] outside doctor to get ADD medication so she could focus." (Tr. 373). She reported needing more energy to complete tasks. (*Id.*). At the appointment, Guido was noted to be "guarded and somewhat distrusting." (*Id.*). The therapist discussed concerns with obtaining medication outside of the psychiatrist's recommendations and recommended Guido coordinate her care. (Tr. 374). Guido appeared unconvinced about doing so, however. (Tr. 375). She was also noted as having trouble coping with the impending death of her grandmother. (*Id.*).

At therapy sessions in late May into June 2010, Guido expressed increasing distrust of others, including the therapist. (Tr. 361-372). She was found to be guarded and hesitant, sometimes labile, and reported feelings not always consistent with her affect. (*Id.*). She reported wanting to work toward being able to work again, and later reported working a few hours a week. (*Id.*). In July 2010, Guido continued to receive Adderall from Dr. Hassan. (Tr. 593).

8

At a therapy appointment on July 27, 2010, Guido presented upset, extremely tired and with unclear thinking. (Tr. 357). She reported having a medication review with the psychiatrist where she refused to take any medication other than Adderall, which the psychiatrist did not feel comfortable prescribing. (*Id.*). Guido was noted to be minimizing and denying the presence of a mental illness and her belief that others were trying to drug her. (*Id.*). She was noted to be noncompliant with her medication at this point. (Tr. 359). She presented to the emergency room on July 28, 2010, reporting "not feeling right," with anxiety and a flat affect. (Tr. 268; 271). She reported receiving a new medication the day before from her psychiatrist and that it made her feel like she was crawling out of her skin. (Tr. 271). At the same time she admitted being noncompliant with her medications because she did not like taking them. (*Id.*). She reported leaving work early as a result of her condition. (*Id.*). She was counseled to discuss medication issues with her provider rather than just stopping them on her own, prescribed Vistaril, and released. (Tr. 271-73). At a therapy session in August 2010, Guido again reported wanting to stop treatment, and that she no longer believed she had a mental illness. (Tr. 354). The therapist accepted Guido's decision to take a break from treatment and agreed to keep her case open for 60 days in case she changed her mind. (Tr. 354-56). On September 7, 2010, Guido again got a renewal from Dr. Hassan for her Adderall, reporting difficulty concentrating. (Tr. 593).

On October 29, 2010, she was admitted again to the hospital for inpatient treatment. (Tr. 318-50). She reported having broken up with a boyfriend, that her grandmother died, and that she felt like her family was controlling her. (Tr. 318). She reportedly had stopped taking her medications, and noted depression and racing thoughts. (Tr. 318-19). Upon exam, Guido was noted to have psychomotor agitation, was tearful, anxious and had circumstantial and pressured speech. (Tr. 319). She was difficult to redirect, sad, with labile mood, suicidal ideation,

9

paranoia, limited insight and poor concentration.  (*Id.*).  She was diagnosed with bipolar disorder, mixed episode with suicidal ideations and issued a GAF score of 20.  (Tr. 318).  She was prescribed Depakote, Seroquel and Neurontin.  (Tr. 320).  During the course of her treatment, Guido remained hyperverbal, angry, with racing thoughts.  (*Id.*).  For a period of time she also refused to comply with her medication recommendation.  (*Id.*).  She eventually became compliant, and noted improvement in her condition as a result.  (*Id.*).  She also began attending therapy.  (*Id.*).  However, at discharge on November 9, 2010, Guido was assessed with the same GAF score she had upon admittance, 20.  (Tr. 318).

Guido returned to outpatient treatment on November 11, 2010.  (Tr. 212-222; 226).  She presented anxious, irritable and demanding.  (Tr. 217; 226).  She had impaired concentration, and no insight into her illness.  (Tr. 218).  A treatment plan was created and Guido's prognosis was listed as "fair."  (Tr. 222).  A psychiatric evaluation was conducted on November 16, 2010.  (Tr. 256-63).  Guido again denied having a mental illness.  (Tr. 256).  She presented as cooperative and amicable, but also hyperverbal, distractible, depressed, with racing thoughts and impaired concentration.  (Tr. 258-61).  Her responses appeared irrelevant and she was preoccupied and tangential.  (*Id.*).  She also suffered from a flight of ideas and elation.  (*Id.*).  She was diagnosed as bipolar with last episode manic and issued a GAF score of 10.  (Tr. 262).  The psychiatrist took Guido off Depakote and Neurontin and started her on Lithium.  (*Id.*).

Guido attended therapy from November 11 through December 7, 2010 and during that time her mood fluctuated from euthymic to labile to angry, irritable and anxious.  (Tr. 227-238; 240).  At times she was attentive and alert, while at other times she was easily distracted.  (*Id.*).  At one point she complained of dry mouth and shaking hands as a side effect to her medication.  (Tr. 235).

ii.     *After Alleged Onset Date*

On December 8, 2010, Guido was once again admitted to inpatient treatment, after an altercation with her grandmother. (Tr. 292). Her family reported both homicidal and suicidal statements by Guido. (*Id.*). A mental status exam revealed a range of emotions and affect, from tired and mellow to animated, loud and angry, to crying. (Tr. 293). She was diagnosed with bipolar disorder, mixed episode and issued a GAF score of 25. (Tr. 293-94). She was continued on Lithium and Seroquel, and Ambien was added to aid sleep. (Tr. 294). At first during treatment Guido refused her medication, but eventually became compliant and was discharged on December 13, 2010 with a GAF score of 65. (Tr. 292-317).

Guido began outpatient treatment again after discharge. (Tr. 241). For the next three months, her condition steadily improved. Therapy notes from this period showed that Guido's mood was usually euthymic or euphoric, she was attentive and alert, and her concentration and attention was intact. (Tr. 241-255). She reported medication compliance, a more stable mood, no side effects, and an ability to function daily with chores. (Tr. 252-53). At one point, her peer support specialist noted that her "quick moving recovery" was "phenomenal" and "amazing." (Tr. 248-49). Guido suffered a relapse in March 2011, however, with treatment and therapy notes showing an increase in anxiousness, anger, and depression, and difficulty focusing. (Tr. 223-24; 577; 579-80). At one point she informed her psychiatrist that she did not want to take her medications due to thought commands and said that Dr. Hassan had previously prescribed Adderall and that she wants to take it again to help her focus. (Tr. 580). Over the next few months, Guido continued to report difficulty focusing, with an increase in depression and anxiety. (Tr. 568-78). At one appointment with her psychiatrist, she attempted to justify needing Adderall, but was talked down by her aunt and the psychiatrist. (Tr. 569). She asked to

lower her Seroquel dose due to drowsiness.  (*Id.*).  It does not appear Dr. Hassan was prescribing Adderall at this time.  (Tr. 588-91).

From May into June 2011, Guido continued to be mostly depressed and quiet, sometimes angry, irritable and tearful, yet attentive and alert during therapy sessions.  (Tr. 555-67).  During June and July 2011, Guido showed improvement, including a more stable mood that was often euthymic, good concentration and attention, and even reported volunteering at a school several hours a week.  (Tr. 548-554).  Her euthymic mood generally continued from August through October 2011, although there were sessions where she was noted to be either depressed or of labile mood, and she was noted on several occasions to be verbally aggressive, either to family members or other participants.  (Tr. 525-47).  One altercation, with her aunt in August 2011, centered on a belief she was taking Adderall again.  (Tr. 547).  It appears that Dr. Hassan did prescribe Adderall to Guido that month.  (Tr. 584).

By November 2011, Guido had again regressed, resulting in another inpatient treatment from November 15 through November 21.  (Tr. 444-82; 520-24).  She presented with poor hygiene, and was irritable, agitated, guarded and suspicious.  (Tr. 444).  Her family reported that she had been crying and laughing inappropriately, obsessively painting her nails and cleaning.  (*Id.*).  She was also noted to have at one point cleaned the floor with cooking oil and drank coffee creamer for dinner.  (*Id.*).  Guido reported that this had been ongoing for at least two weeks and that she had not taken her medication for the last four days.  (Tr. 444).  Her aunt believed Guido was taking Adderall again.  (Tr. 445).  Guido was diagnosed with bipolar disorder, mixed with psychosis and issued a GAF score of 25.  (Tr. 446; 482).  During the first few days of inpatient treatment, Guido continued to have racing thoughts, difficulty making decisions, and unpredictable behavior.  (Tr. 454-55; 460-61).  She continued to be anxious, with

blunted affect and a disheveled appearance. (*Id.*). She often left group therapy sessions early, or went in and out of sessions. (Tr. 455; 456). She eventually became medically compliant, gaining insight into her condition and reporting and exhibiting more stabilized mood, but this was short-lived, as she soon became irritable again, losing insight into her condition. (Tr. 456-57; 458-59). She also continued to have difficulty in therapy sessions, frequently leaving, being excused for sleeping, or being asked to leave due to disruption. (Tr. 458-59; 461-63; 465-66). One therapy note from this period documented a need for "constant supervision." (Tr. 463). On her discharge date, she still exhibited tearfulness and agitation at times. (Tr. 459-60). There does not appear to be a treatment note in the record reflecting the reason for discharge or Guido's status upon discharge.

Guido returned to outpatient treatment after discharge. In therapy sessions from the end of November 2011 through the end of the medical record, in March 2012, Guido was found to be medically compliant, and her treatment notes reflect a consistently euthymic mood and improved stabilization. (Tr. 484-518). She presented alert and attentive, and often actively participated in group therapy, including giving feedback to others. (*Id.*). She discussed wanting to participate in volunteer activities to keep busy. (*Id.*). It appears that in December 2011, Dr. Hassan again renewed Guido's Adderall prescription. (Tr. 582).

### D.     The ALJ's Findings

Following the five step sequential analysis, the ALJ found Guido not disabled. At Step One she determined that she had not engaged in substantial gainful activity since her alleged onset date. (Tr. 14). At Step Two she found the following severe impairment: bipolar disorder. (*Id.*). At Step Three she concluded that Guido's impairment did not meet or medically equal a listed impairment. (Tr. 14-15). In rendering this finding, the ALJ found that Guido did not meet

the "Paragraph B" criteria which require her to suffer from marked limitations in two of four different areas. (Tr. 15). Instead, she found she had only a mild limitation in activities of daily living, moderate difficulties in maintaining social functioning, moderate limitations in maintaining concentration, persistence and pace, and no repeated episodes of decompensation of extended duration. (*Id.*). She also concluded that she did not meet any of the Paragraph C criteria, finding that her living situation with her brother did not rise to the level of a "highly supportive living arrangement" as envisioned by that paragraph. (Tr. 15-16).

Next, the ALJ assessed Guido's residual functional capacity ("RFC"), finding her capable of work at all exertional levels, but with limitations to "unskilled, non-production-oriented work with low-stress social demands. She may have occasional contact with the general public, coworkers, and supervisors with only minimal changes in the work setting." (Tr. 16). At Step Four the ALJ determined that Guido could not return to her past relevant work. (Tr. 36). At Step Five, she concluded, based on her age, education, vocational background and RFC, and coupled with VE testimony, that there were a significant number of jobs in the national economy that Guido could perform, such that she was not disabled under the Act. (Tr. 18-19). These jobs included box assembler (3,000 jobs in the region), inspector/laundry (2,500 jobs), small products assembler (3,500 jobs), and linen sorter (3,000 jobs), among others. (Tr. 19).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d

591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide

15

the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**F.    Analysis**

Guido argues that the ALJ made several errors in rendering her decision finding Guido not disabled.  She argues that the ALJ erred in her Step Three determination, in several respects: (1) she failed to discuss the Paragraph A criteria and compare Guido's condition to those criteria; (2) she failed to obtain an updated expert medical opinion regarding medical equivalency; and (3) she improperly found that she had only mild and moderate limitations in the functional areas and no episodes of decompensation when the evidence supports a finding of marked limitations and repeated episodes of decompensation.  Guido further argues that the ALJ erred in assessing her credibility and rendered an improper RFC assessment.  The Court agrees that the ALJ erred at Step Three and in her RFC determination, and that this case requires remand as a result.  Thus, the Court does not address Guido's credibility argument.

### 1.    *The ALJ's Step Three Determination*

#### a.    *The ALJ's Application of Listing 12.04 Paragraph A*

Guido argues that the ALJ erred in the assessment of her bipolar disorder under Listing 12.04.  She first argues that the ALJ wholly failed to make a determination of whether her bipolar condition met the requirements of an affective disorder as required by Listing 12.04(A), and that the ALJ's failure to compare her symptoms to the elements of Listing 12.04(A)[2] leaves

---

[2] To qualify for a disability under Listing 12.04, a claimant must first exhibit a medically documented persistence of either a depressive syndrome, manic syndrome, or bipolar syndrome, as characterized by the various symptoms of those syndromes found in subsection (A) of the listing.  In addition, a claimant must then satisfy either the (B) or (C) criteria of the same listing. 20 C.F.R. Appendix 1, Subpt. P, Pt. 404, Listing 12.04 (Affective Disorders).

the Court to speculate which of the multiple elements of that paragraph the ALJ found were not satisfied.  The Commissioner responds that the ALJ had already concluded at Step Two that Guido suffered from bipolar disorder, and thus her failure to specifically discuss the Paragraph A criteria was harmless since she had already concluded that that those criteria were satisfied.  Further, the Commissioner argues that the ALJ's discussion of both the Paragraph B and C criteria of Listing 12.04 is evidence that the she presumed that Guido met the Paragraph A criteria.  The Court agrees.

In a similar case, the ALJ failed to specifically discuss whether the claimant met the Paragraph A criteria for listing 12.04.  *Sommers v. Comm'r of Soc. Sec.*, No. 12-213, 2012 U.S. Dist. LEXIS 162883, *39 (N.D. Ohio Nov. 14, 2012).  The court noted that, despite this lack of discussion, the ALJ had found conclusively that the claimant suffered from a major depressive disorder, and -since the ALJ "did not question the existence of medical evidence establishing the persistence of Plaintiff's depressive syndrome, as required by paragraph A criteria, there was no need to go into any detail on this point." *Id.*  The same analysis applies here.  Despite the ALJ's failure to discuss the Paragraph A criteria, her clear acceptance of Guido's well-documented diagnosis of bipolar disorder rendered any further discussion of those criteria unnecessary.  Thus, the Court finds the ALJ did not err in this respect.

b.   *Medical Opinion on Equivalency*

The only opinion on medical equivalency of record is the one issued by a reviewing psychologist on the March 23, 2011 Disability Determination and Transmittal ("DDT") form at the initial denial stage.  (Tr. 53-54).  However, that form, by its very nature, does not indicate what particular medical evidence the psychologist reviewed in reaching her decision, nor any explanation of that decision.  (*Id.*).  Guido argues that the ALJ erred in not obtaining an updated

17

medical equivalency opinion.  At the very least, Guido argues, a medical expert should have been retained to review her complete records, especially here, where the bulk of the medical evidence, including at least one episode of decompensation, occurred after the date of the psychologist's review.

The question of a claimant's medical equivalence to a listed impairment is an issue for the ALJ to determine.  *See* 20 C.F.R. §§ 404.1526(e), 416.926(e), 404.1545(a), 416.945(a).  In determining medical equivalence, Social Security Ruling 96-6p advises:  "[L]ongstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge . . . must be received in to the record as expert opinion evidence and given appropriate weight."  1996 SSR LEXIS 3 at *8 (July 2, 1996).  The signature of a State agency medical or psychological consultant on a DDT form ensures that consideration by a psychologist designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review.  *Id.*  The Sixth Circuit has held that such signature may be relied upon by an ALJ as evidence that a claimant's medical equivalence has been considered and rejected.  *Sheets v. Bowen*, 875 F.2d 867, 1989 U.S. App. LEXIS 14596 at *10-13 (6th Cir. 1989).  Therefore, as a general matter, an ALJ does not err in relying on the signing doctor to a DDT form as support for a finding that medical equivalency does not exist.

However, here, despite the fact that the ALJ *could* have relied on the DDT-signatory doctor's determination of medical equivalency, there is no evidence that she actually did do so, as her decision does not mention that finding, let alone analyze the weight given to it and the reasons for that weight.  (Tr. 15-16).  *See Leonard v. Astrue*, No. 08-6464, 2010 U.S. Dist. LEXIS 119785, *27 (N.D. Ill. Nov. 10, 2010) (remanding where ALJ failed to mention, let alone

support reliance upon reviewing doctor's disability evaluation in determining medical equivalence). Nor does there appear to be in the record a Disability Determination Explanation ("DDE") form, which would reveal the DDT-signatory's actual findings related to her conclusion that Guido did not meet the standard for medical equivalency. *See e.g. Moore v. Astrue*, No. 12-11020, 2012 U.S. Dist. LEXIS 184722 (E.D. Mich. Dec. 28, 2012) (discussing content of mental DDE form, which includes analysis of functional limitations as well as reasons for disability determination). Without an actual discussion by the ALJ as to the weight given to the DDT-signatory doctor on medical equivalence, and without any way to assess whether the ALJ's failure to discuss this opinion is merely harmless, (i.e. by showing that she actually considered, but simply did not refer to the DDT-signatory's opinion on the issue of medical equivalency), the Court cannot adequately review the ALJ's Step Three determination. If the ALJ did in fact rely on the DDT doctor's decision on medical equivalency, her failure to articulate in her decision the reasons for doing so is error because it prevents this Court from conducting a meaningful review of that determination. *See Leonard*, 2010 U.S. Dist. LEXIS 119785 at*27. If she did not rely on it, then she violated the regulations requiring a medical expert opinion on the issue of medical equivalency. *See SSR 96-6p*, 1996 SSR LEXIS 3. Either way, the ALJ erred, requiring remand.

The Court further notes that without the DDE form, there is no way to know whether the abundance of treatment records on file dating after the initial denial in March 2011, including at least one episode of decompensation requiring hospitalization, may have altered the reviewing doctor's opinion on medical equivalency. Although there is no categorical requirement that a non-treating source's opinion be based on a "complete" record, courts have recognized that, under certain circumstances, it is error for the ALJ to accord significant weight to a "stale"

opinion of a non-treating source.  *See, e.g.*, *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408-09 (6th Cir. 2009); *Blanchard v. Comm'r of Soc. Sec.*, 2012 WL 1453970, at *18 (E.D. Mich. Mar. 16, 2012); *Garber v. Astrue*, 2012 WL 1069017, at *10 (N.D.N.Y. Mar. 2, 2012) ("It is true that stale, conclusory reports of state agency officials based upon incomplete medical records may not constitute substantial evidence).  Furthermore, SSR 96-6p requires an ALJ to obtain an additional medical expert opinion when "additional medical evidence is received that in the opinion of the administrative law judge . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments."  1996 SSR LEXIS 3 at *9.  Here, because there was no DDE form explaining the reviewing psychologist's findings, there was no way for the ALJ to determine whether additional available medical evidence would have altered that psychologist's conclusions on medical equivalency.  For the same reasons this Court cannot adequately review any such determination.

Finally, the lack of the DDE form means that there is not one medical opinion, consulting, treating or otherwise, in the record opining on functional limitations arising from Guido's severe mental impairment.  The Sixth Circuit has "stressed the importance of medical opinions to support a claimant's RFC, and cautioned ALJs against relying on their own expertise in drawing RFC conclusions from raw medical data."  *Wyatt v. Comm'r of Soc. Sec.*, No. 12-11406, 2013 U.S. Dist. LEXIS 117225 (E.D. Mich. Aug. 19, 2013) *50-51 (quoting *Mistoff v. Comm'r of Soc. Sec.* , No. 12-046, 940 F. Supp.2d 693 (S.D. Ohio 2013)).  *See also infra* at 22.  While ultimately the RFC assessment is the purview of the ALJ, (20 C.F.R. § 404.1527(d)), in all but situations where "the medical evidence shows relatively little physical impairment" such that the ALJ can permissibly render a commonsense judgment about the functional capacity even

absent a physician's assessment, the ALJ must generally obtain a medical expert opinion on the subject.[3]  *Lindsey v. Comm'r of Soc. Sec.*, No. 12-12585, 2013 U.S. Dist. LEXIS 165779, *20-21 (E.D. Mich. Sept. 26, 2013) adopted by 2013 U.S. Dist. LEXIS 164913 (E.D. Mich. Nov. 20, 2013) (quoting *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008); *see also Berger v. Comm'r of Soc. Sec.*, No. 12-11779, 2013 U.S. Dist. LEXIS 116399, *36 (E.D. Mich. July 23, 2013) (finding reversible error where ALJ discredited treating physician functional capacity assessment, but where there was no other functional assessment in the record upon which the ALJ could have relied).  The Court finds that this is not a situation where "the medical evidence shows relatively little [ ][4] impairment" such that "an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment."  *Wyatt* 2013 U.S. Dist. LEXIS 117225 (citing *Mistoff*, 40 F. Supp. 2d 693.  Given all the evidence of record, including a period of decompensation and consistent treatment with serious psychiatric medications, there is no question that Guido suffers from more than "relatively little" impairment, and the Court cannot say that the RFC imposed by the ALJ is supported by substantial evidence.  Accordingly, this matter should be remanded so that the ALJ may obtain a proper medical opinion on Guido's functional abilities.

The Commissioner argues essentially that Guido's failure to request a consultative examination at any time during the administration of her claim, or provide the ALJ with a

---

[3] The Court has not found a case in which this principle was discussed or applied with respect to a mental impairment, but the Court sees no reason why it would not apply with equal force in that context.  Just as ALJ's, despite their expertise in determining eligibility for disability based on medical opinions, are generally (*i.e.*, other than where the evidence shows relatively little impairment) unqualified to determine functional physical limitations directly from the medical evidence, so too are they generally unqualified to determine functional mental limitations from the medical evidence.

[4] *See supra*, fn. 2.

treating doctor's opinion, renders her argument here waived.  The Court disagrees.  While it is true that the burden to prove disability rests with the claimant, (20 C.F.R. § 404.1512(a)), courts have recognized that social security proceedings are "inquisitorial rather than adversarial."  *Sims v. Apfel*, 530 U.S. 103, 110-11, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000).  As a result, an ALJ has an affirmative duty to develop the factual record upon which her decision rests, regardless of whether the claimant is represented by legal counsel at the administrative hearing.  *See Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983); *Martin v. Comm'r of Soc. Sec.*, No. 12-14773, 2014 U.S. Dist. LEXIS 35189, *48-49 (E.D. Mich. Feb. 18, 2014).  Furthermore, it remains true an ALJ may not, even in the face of a well-represented claimant, rely on her own evaluation of the raw medical evidence to determine whether a claimant meets or medically equals a listed impairment, or the functional limitations to be imposed upon such claimant.  While in other factual scenarios, a claimant's failure to request an updated review of medical records or a consultative examination might constitute waiver on appeal, (*see. e.g. Watters v. Comm'r of Soc. Sec.*, No. 11-13860, 2012 U.S. Dist. LEXIS 125701, *20-21 (E.D. Mich. June 28, 2012) (finding that plaintiff's failure to object to ALJ's early termination of the hearing without extensive witness examination waived his argument on appeal as to the error of that decision), the Court finds that the ALJ's error here cannot be justified on such a basis.

For these reasons, the Court finds that the ALJ committed error that requires remand to obtain a medical expert opinion on the issue of medical equivalency and Guido's mental functional limitations, and consider any other evidence Guido wishes to present.  *See Lindsey*, 2013 U.S. Dist. LEXIS 165779, *19-20 (classifying as error ALJ's making of own medical finding regarding RFC limitations); *Berger*, 2013 U.S. Dist. LEXIS 116399, 32-36 (noting that while "the final responsibility for deciding the RFC 'is reserved to the Commissioner,'" "courts

22

have stressed the importance of medical opinions to support a claimant's RFC, and cautioned ALJs against relying on their own expertise in drawing RFC conclusions from raw medical data."); *see also Lagrone v. Colvin*, 2013 U.S. Dist. LEXIS 167273 (N.D. Tex. Nov. 5, 2013) (ALJ's formation of RFC by relying on medical evidence that itself did not contain any opinions as to claimant's mental functional limitations was error requiring remand).

## III.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Guido's Motion for Summary Judgment **[14]** be **GRANTED IN PART** to the extent it seeks remand, and **DENIED IN PART** to the extent it seeks reversal and outright award of benefits, the Commissioner's Motion **[17]** be **DENIED** and this case be **REMANDED** for further consideration consistent with this Report and Recommendation.

Dated: July 29, 2014                                s/David R. Grand
Ann Arbor, Michigan                               DAVID R. GRAND
                                                             United States Magistrate Judge


## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to

E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 29, 2014.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager